# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

| | | |
|---|---|---|
| PETER C. TSAKALAKIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.     08-cv-1175 |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## O R D E R  &  O P I N I O N

This matter is now before the Court on Plaintiff's Motion for Summary Judgment (Doc. 13) and the Commissioner's Motion for Summary Affirmance (Doc. 16). For the following reasons, Plaintiff's Motion for Summary Judgment (Doc. 13) is DENIED, and the Commissioner's Motion for Summary Affirmance (Doc. 16) is GRANTED.

## BACKGROUND

Plaintiff, Peter C. Tsakalakis ("Tsakalakis") was 52 years old at the time of his administrative hearing. He is a high school graduate and has an associate's degree as an electronics technician. From 1979 until August 9, 2005, Tsakalakis worked as an electronic technician.  He last worked in 2005. Tsakalakis applied for Disability Insurance Benefits ("DIB") on December 21, 2005, alleging that he became disabled on August 9, 2005.

## A. History of Medical Treatments

On August 9, 2005, Tsakalakis injured his left knee and central tendon in his left arm while lifting a heavy television at work. He was treated at an emergency room and advised to see an orthopedic surgeon.

On August 11, 2005, Tsakalakis sought treatment by Dr. Dirk Nelson, an orthopedic surgeon. He had x-rays of his left shoulder and left knee. Dr. Nelson noted that besides the rupture of the left bicep, other musculoskeletal issues were due to aches and pains and should improve within two to three weeks. An MRI revealed spinal stenosis at L3-L4. Dr. Nelson indicated that spinal stenosis, the abnormal narrowing of the vertebral canal, nerve root canals, or intervertebral formania of the lumbar spine, would likely explain Tsakalakis' back and leg symptoms. On August 25, 2005, Tsakalakis sought treatment from Dr. Nelson again. Dr. Nelson found Tsakalakis' hands, wrists and elbows functioned normally. After noting that Tsakalakis was a nervous individual who needed reassurance that his complaints of pain were not serious, Dr. Nelson placed him on temporary duty disability status.

Three days prior, on August 22, 2005, Tsakalakis visited Dr. Sonnenberg, an orthopedic surgeon, for his biceps injury. Dr. Sonnenberg examined Tsakalakis' right shoulder and observed a full range of motion, no significant swelling, and mild tenderness. Dr. Sonnenberg suggested surgery but agreed that Tsakalakis could try therapy. Tsakalakis saw Dr. Sonnenberg again on September 19, 2005. He continued to complain of pain in his left shoulder. Dr. Sonnenberg noted tenderness

with positive impingement signs on the left bicep. Dr. Sonnenberg wrote that with therapy of upper extremities, Tsakalakis would probably be ready to return to normal duties at work within four to six weeks.

On September 20, 2005, Tsakalakis saw Dr. Michael Zindrick, an orthopedic surgeon. He reported lower back pain radiating down his left leg. Dr. Zindrick observed pain with flexion beyond 45 degrees, extension beyond 10 degrees, and side bending beyond 20 degrees bilaterally. He observed that Tsakalakis had pre-existing asymptomatic congenital neural spinal canal spondylolisthesis and spinal stenosis at L3-4. X-rays further revealed degenerative changes of lumbar spine at L3-4 with grade 1 spondylolisthesis, which is the forward movement of one lumbar vertebrae on the one below it or on the sacrum. Dr. Zindrick observed that Tsakalakis had full range of motion in his hips, was able to toe walk and heel walk, had no motor weakness, had symmetrical reflexes, and had normal sensation to pin prick and light touch. Dr. Zindrick recommended back surgery for Tsakalakis.

On October 11, 2005, Dr. Nelson ordered an MRI of Plaintiff's knee, which showed a torn medial meniscus and small cyst adjacent to the head of the fibula. Dr. Nelson recommended arthroscopic surgery for the knee. Tsakalakis did not want to pursue surgery, so Dr. Nelson noted that he would not see Tsakalakis for a follow-up unless Tsakalakis wished to discuss arthroscopic surgery at a later date.

On October 17, 2005, Tsakalakis returned to Dr. Sonnenberg. Dr. Sonnenberg noted that while Tsakalakis's left shoulder revealed a rupture of the left bicep, it resulted in only mind impingement pain. He noted that Tsakalakis

could lift fifteen pounds with his left arm without problems. Dr. Sonnenberg opined that Tsakalakis could probably return to work with a fifteen pound lifting limit. He also recommended a steroid injection but Tsakalakis declined. Dr. Sonnenberg discharged Tsakalakis from further care as he did not see anything else he could do for him. On November 2, 2005, Tsakalakis sought treatment from Dr. Sonnenberg again. Dr. Sonnenberg noted that Tsakalakis seemed to be a hypochondriac and observed only tenderness and no serious problems in the right arm.

On November 1, 2005, Dr. Michael Orth examined Tsakalakis for his employer's insurer in connection with his worker's compensation claim. Dr. Orth observed the "popeye" muscle in Tsakalakis' left arm, but noted that he had full mobility, no tenderness, and no neurovascular deficit in either extremity. Dr. Orth reported that he did not consider Tsakalakis' problems work-related and concluded that Tsakalakis could return to his regular job.

On December 21, 2005, Tsakalakis interviewed with the Social Security Administration ("SSA") concerning his application for disability benefits. The SSA interviewer observed that Tsakalakis had no difficulty hearing, speaking, sitting, standing, walking or using his hands.

On January 10, 2006, Tsakalakis was seen by Dr. Demetrios Giokaris, Tsakalakis' family doctor. Dr. Giokaris completed a Medical Evaluation-Physicians Report for the State of Illinois. On this form, Dr. Gioarkis checked off boxes to indicate that Tsakalakis had decreased sensation in his legs, could only lift up to ten pounds at a time, had limited ability to walk, bend, stand, stoop, turn, climb,

push, pull, speak, travel and perform fine and gross manipulations. Dr. Giokaris noted that Tsakalakis suffered from depression. He further reported that Tsakalakis had limitations in performing activities of daily living, extreme limitations in social functioning, and extreme limitations in concentration, persistence or pace.

On January 30, 2006, Dr. C.C. Prodromos examined Tsakalakis' left arm, shoulder, left knee and lower back. Dr. Prodromos observed the "popeye" deformity in the left biceps but noted that Tsakalakis had good maintenance in other areas. Dr. Prodromos reported abnormalities in the left shoulder and mildly diminished range of motion in the lumbar spine. X-rays of the knees and shoulder were normal. An MRI of the knee revealed chondromalacia of the patella and trochlea and a posterior horn medial meniscus tear. An MRI of the shoulder showed a torn or subluxated biceps tendon, supraspinatus tendinosis, and other possible abnormalities. An MRI of the lumbar spine revealed spinal stenosis and likely spondylolysis. Dr. Prodromos recommended knee surgery to correct the torn meniscus but recommended only epidural injections to treat Tsakalakis' back pain. Dr. Prodromos also observed Tsakalakis' hearing loss and opined that it would be difficult for him to return to work.

On February 7, 2006, Dr. Mahesh Shah examined Tsakalakis for a medical consultative exam. Dr. Shah observed that Tsakalakis moved slowly. Dr. Shah noticed that Tsakalakis could move from the sitting to supine position but needed help to get up from the supine position due to pain. While Dr. Shah recorded that

Tsakalakis had decreased hearing, he also noted that Tsakalakis could hear fairly well with hearing aids, which he had been using for thirty-five years. Based on Tsakalakis' history and examination, Dr. Shah indicated that Tsakalakis had only some limitations in motion with respect to back, shoulder and knee pain but no other significant abnormality.

On February 22, 2006, Dr. Zindrick examined Tsakalakis in connection with his workers' compensation Claim. Besides a diminished right ankle reflex, he made no other findings of clinical abnormalities. Dr. Zindrick concluded that Tsakalakis "will remain off work unless a light duty job can be identified." On the Work Status Report, Dr. Zindrick checked the box indicating that modified work was not available at Tsakalakis' worksite and that Tsakalakis was unable to return to work. Tsakalakis filled out an Oswestry Disability Index 2.0 form, where he indicated that his pain was moderate, that he could look after himself normally, could lift light to medium weight, could sit and stand for up to an hour at a time, and could walk up to a mile. He also noted that his sleep was only occasionally disturbed by pain and neither his travel nor social life were restricted by pain.

On February 23, 2006, Dr. Young-Ja conducted a residual functional capacity ("RFC") assessment and concluded that Tsakalakis could lift twenty pounds occasionally and ten pounds frequently, could stand and sit about six hours each in an eight hour workday, and that he required no limitations for pushing or pulling. Dr. Young-Ja limited Tsakalakis to only occasionally ladder, rope or scaffold work, occasional overhead reaching with the left arm, and placed a limitation on

concentrated noise exposure. Dr. Young-Ja's RFC consideration considered Tsakalakis' severe spinal stenosis and torn medial meniscus.

On March 23, 2006, Dr. Marie Kirincic's progress note revealed that Tsakalakis was unwilling to explore surgery mainly out of fear. The note indicated that Tsakalakis benefited from physical therapy with improvements in his lumbar range of motion and subsistence of lower back pain. Dr. Kirincic wrote that Tsakalakis will remain off of work due to pending knee surgery and there was no light duty available at his work.

On April 4, 2006, Dr. Prodromos performed arthroscopic knee surgery on Tsakalakis. Tsakalakis had physical therapy after the surgery and the knee improved. Dr. Prodromos also ordered an MRI of Tsakalakis' right shoulder, which revealed inflammation, mild to moderate degeneration or contusion of supraspinatus, and moderate to advanced degenerative joint disease of the AC joint.

On May 17, 2006, Tsakalakis reported to Dr. Zindrick that he continued to experience pain in his low back with numbness, pain, weakness, and tingling in both his legs. His pain ranged from a 4 to a 10 out of 10, but typically at a 6. Tsakalakis reported worsening of pain after standing for 20-25 minutes, walking for half a block, or in the morning. Tsakalakis continued to have decrease range of motion of the lumbosacral spine. Tsakalakis was able to heel and toe walk and ambulate with the aid of a cane.

On July 16, 2006, Dr. Prodromos notes in his progress report that Tsakalakis' knee improved much since the surgery, Tsakalakis had a full range of motion and could perform light activities.

In July of 2006, Tsakalakis began treatment with Dr. Everett, a chiropractor. Chiropractic treatment provided temporary benefits and Dr. Everett noted that when standing in one position, bending or lifting, Tsakalakis experienced pain throughout his lower back and leg. By October 9, 2006, Dr. Everett reported that Tsakalakis had improved to the point where he was no longer in constant pain, walked without a cane, and was able to perform more daily activities without discomfort.

On December 18, 2006, Dr. Giokaris wrote a letter addressed "To Whom It May Concern" and concluded that Tsakalakis is totally disabled.

## B. Administrative Hearing

On December 20, 2006, Tsakalakis appeared before Administrative Law Judge David Thompson ("ALJ") and testified regarding his injuries. Tsakalakis testified that because of ongoing back and knee pain, he could not sit or stand for more than 20-25 minutes at a time, walk more than half a block and had significant pain when bending. Tsakalakis estimated that he could lift only 5-10 pounds if he had to do it all day long and used a cane for prolonged walking. He testified that he could not lift more than 20-25 pounds with his left arm, 35 pounds with his right, sometimes had visitors, and drove 20-30 miles per week. Tsakalakis said he took Lyrica, a prescription medication typically used for neurological pain. Tsakalakis

also testified that he could not return to his old job because it required too much sitting, the technology had changed, and he was not familiar with the new technology.

A vocational expert ("VE") testified that Tsakalakis' job was at a medium exertional level and there were no jobs in his field at a light level. The VE indicated that a person of Tsakalakis' age, education and work experience, who could do a full range of light work, who is limited to occasional use of ropes, ladders and scaffolds, and who could reach only occasionally with his left arm and had to avoid concentrated exposure to noise, could not do Tsakalakis's past work. The VE testified that there were jobs available at the light exertional level requiring transferable skills such as 1,000 electronic assembly inspector positions, and sufficient light jobs in other fields at an unskilled level, including 3,000 assembly positions, 1,500 packaging positions, 1,000 information clerking positions, 8,000 greeter positions, and 500 usher positions.

Among the jobs available, the VE articulated that if only overhead reaching was limited, a person could perform jobs such as assembly and packaging jobs, information clerking jobs, and semi-skilled inspector jobs. If a person could do only occasional reaching, the VE testified that assembly and packaging jobs would be eliminated. If a person could not consistently communicate with the public due to hearing loss, the VE said that information clerking jobs and greeter and usher jobs would be eliminated.

Following the testimony, on May 21, 2007, the ALJ issued his decision. The ALJ found that Tsakalakis met the insured status requirement through September 30, 2009, had not engaged in substantial gainful activity since August 9, 2005, and had a severe combination of impairments, including lumbar stenosis and a left torn meniscus. However, he determined that Tsakalakis did not have a listing level impairment.

After considering the medical evidence in the record and relevant credibility factors as a whole, the ALJ found that Tsakalakis retained the RFC to perform light work activities, subject to postural and environmental limitations. These limitations include not lifting more than 20 pounds occasionally or 10 pounds frequently, occasional climbing of ladders, scaffolds and ropes, and avoiding concentrated exposure to noise. The ALJ's assessment was based on the medical records which indicated a history of conservative treatment by physicians, clinical exams showing only mild abnormalities, Tsakalakis' refusal of some recommended treatments, and several opinions concluding that Tsakalakis could perform light work activities. While the ALJ decided that Tsakalakis could not perform any past relevant work, he found that Tsakalakis could perform a significant number of jobs. Therefore, the ALJ denied Tsakalakis's claim.

Tsakalakis filed a request for view. In his request, Tsakalakis submitted a letter from Dr. Prodromos based on a June 4, 2007 examination. In the letter, Dr. Prodromos reported that despite physical therapy, Tsakalakis still experienced pain when his shoulder was elevated. He noted that the lumbar spine condition was

unchanged and considered Tsakalakis permanently disabled. The Appeals Council denied Tsakalakis' request for review, making it the final decision of the Commissioner.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND THE COMMISSIONER'S MOTION FOR SUMMARY AFFIRMANCE

### A. Legal Standard

In order to be entitled to SSI and/or DIB, a plaintiff must show that his inability to work is medical in nature and that he or she is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of employers are irrelevant in determining whether a plaintiff is eligible for disability benefits. *See* 20 C.F.R. §§ 404.1566, 416.966 (1986).

The establishment of disability under the Act is a two-step process. First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382(c)(a)(3)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 615 F.2d 142, 143 (7th Cir. 1980). That factual determination is made by using a five-step test. *See* 20 C.F.R. §§ 404.1520, 416.920.

The five-step test is examined by the ALJ, in order, as follows: (1) is the plaintiff presently unemployed; (2) is the plaintiff's impairment "severe" (20 C.F.R. §§ 404.1521, 416.921); (3) does the impairment meet or exceed one of the list of

specified impairments (20 C.F.R. Part 404, Subpart P, Appendix 1); (4) is the plaintiff unable to perform his or her former occupation; and (5) is the plaintiff unable to perform any other work within the national economy?

An affirmative answer to any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984). The plaintiff has the burdens of production and persuasion at steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

The Court's function on review is not to try the case *de novo* nor to supplant the ALJ's finding with the Court's own assessment of the evidence. *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). The Court must only determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). In determining whether the ALJ's findings are supported by substantial evidence, the Court must consider whether the record, as a whole, contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). Credibility determinations made by

the ALJ will not be disturbed unless the finding is clearly erroneous. *Anderson v. Bessemer City*, 470 U.S. 564 (1985).

**B. Analysis**

Tsakalakis raises two claims in his appeal: (1) the ALJ erred in his RFC assessment by not addressing work-related functions and not considering all of Tsakalakis' impairments; and (2) the ALJ erred in rejecting the opinions of certain treating physicians.

**1. RFC Assessment**

Tsakalakis claims that the ALJ determination of Tsakalakis' RFC is flawed because it does not address important work-related functions, does not consider all of Tsakalakis' impairments, and is inconsistent with the evidence regarding Tsakalakis' limitations. Tsakalakis maintains that the RFC assessment did not address his ability to stand, walk, or reach. He asserts that given his age, education and work background, he would be disabled under law if he were limited to sedentary work. Tsakalakis argues that the RFC finding did not include a function-by-function analysis of his ability and did not include a finding as to skill level. Therefore, Tsakalakis asserts that because of the ALJ's errors, the factual findings are not supported by substantial evidence.

The ALJ did not err in his RFC assessment concerning Tsakalakis' ability to stand or walk. The ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The ALJ must support his decision with "adequate evidence and explain[] why evidence

supporting the claim was unpersuasive." *Hill v. Astrue*, 295 Fed. Appx. 77, 81 (7th Cir. 2008). The ALJ relied on Dr. Young-Ja's RFC assessment in making his determination. After his examination of Tsakalakis, Dr. Young-Ja reasoned that Tsakalakis could sit and stand for six hours each during an eight hour workday. Tsakalakis also noted in the Oswestry Disability Index 2.0 form he filled out on February 22, 2006, that he could stand and sit for up to an hour at a time and walk up to a mile. Given the existing record, the ALJ reasonably relied on adequate evidence in determining that Tsakalakis could perform light work that required a good deal of walking or standing.

The ALJ did not err in determining that no reaching restriction applied in Tsakalakis' case. Tsakalakis argues that the ALJ should have applied a reaching restriction due to the injuries he suffered on his arm and shoulders. However, the opinions of several doctors establish that no reaching restriction was needed. During Dr. Orth's examination on November 1, 2005, Dr. Orth noted that Tsakalakis had full mobility despite the "popeye" muscle evident in the left arm. Like Dr. Orth, Dr. Prodromos observed the "popeye" muscle during a January 30, 2006 examination. While Dr. Prodromos opined of a mildly diminished range of motion in the lumbar spine and some abnormalities in the left shoulder, he recommended against bicep reattachment surgery because he considered the procedure to only be cosmetic. Dr. Prodromos also expected Tsakalakis's upper extremity pain to gradually diminish. During an examination on February 7, 2006, Dr. Shah indicated that Tsakalakis had some limitations in motion with respect to

back, shoulder and knee pain but found no problems with motor strength in the upper extremities.

The only doctor cited by Tsakalakis who determined that Tsakalakis had a reaching limitation was Dr. Giokaris. On January 10, 2006, Dr. Giokaris indicated that Tsakalakis had limitations in reaching in all directions, including pushing, pulling and performing fine and gross manipulations. The ALJ determined that Dr. Giokaris' assessment was not entirely credible. In making an RFC assessment, the ALJ does not have to give the opinion of a physician "controlling weight" when the opinion is not "well supported by medical findings and not inconsistent with other substantial evidence in the record." *Dixon v. Massaneri*, 270 F.3d 1171, 1177 (7th Cir. 2001). Courts are required to "keep in mind the biases that a treating physician may bring to the disability evaluation" because a "patient's regular physician may want to do a favor for a friend and client, and . . . may too quickly find disability." *Id.* (quoting *Stephens v. Heckler*, 766 F.2d 284, 289 (7th Cir. 1985)).

Here, Dr. Giokaris was Tsakalakis' family doctor. While the ALJ considered Dr. Giokaris' assessment of Tsakalakis' reaching limitations, he concluded that the opinions of Dr. Prodromos, Dr. Orth, Dr. Shah and Dr. Young-Ja were more compelling. He relied on the medical findings of multiple doctors determining that Tsakalakis should not be allotted an overhead reaching limitation. Therefore, given the reasons articulated by the ALJ, his credibility determination of Dr. Giokaris is not "patently wrong." *Dixon*, 270 F.3d at 1177. The substantial evidence in the record supports the ALJ's finding of no reaching limitation for Tsakalakis.

The ALJ also did not erroneously determine the restriction on noisy environments. Tsakalakis argues that the RFC finding on the noisy environments' restriction does not sufficiently address Tsakalakis' hearing problems. Citing to the VE's testimony, Tsakalakis claims that a further restriction on hearing would eliminate jobs that requires a person to adequately communicate with the public. However, Tsakalakis' interactions with doctors and SSA officials do not support a finding that he cannot adequately communication with the public. While the record indicates that Tsakalakis suffered from hearing loss for the past three decade, he was able to find gainful employment through this time by using hearing aids. The SSA interviewer on December 21, 2005 observed that Tsakalakis had no difficulty hearing or speaking during the interview. When Tsakalakis appeared before the ALJ on December 20, 2006, he had no problems communicating with the ALJ despite wearing one hearing aid. None of the doctors noted in their reports that Tsakalakis had difficulty communicating due to his hearing. Because the substantial evidence supports the ALJ's determination of a restriction on noisy environments, Tsakalakis' appeal in this regard must be denied.

Finally, the RFC included a finding as to the skill level of Tsakalakis. At the hearing, the ALJ concluded that Tsakalakis could perform jobs in the unskilled light occupational category. Therefore, Tsakalakis' argument that the ALJ did not include a finding of skill level in his RFC assessment is without merit.

### 2. Opinions of Physicians

Tsakalakis asserts that the ALJ erred in rejecting the opinions of Dr. Prodromos, Dr. Giokaris and the doctors at Hinsdale Orthopedic Associates. He claims that the ALJ should have given significant and controlling weight to these doctors' opinions in assessing his disability. Tsakalakis also maintains that the ALJ did not articulate the rational for his decision in rejecting the credibility and opinions of Dr. Prodromos and Giokaris.

In reviewing the ALJ's decision, it is not the task of this Court to "reweigh evidence, resolve conflicts in the record, [or] decide questions of credibility." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). The ALJ can give less weight to an examining physician's opinion if he considers it "in light of all of the other evidence before him." *See id*. "Weighing conflicting evidence from medical experts" is "exactly what the ALJ is required to do." *Id.* (citing *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996)). An ALJ has a duty to "minimally articulate his or her justification for rejecting or accepting specific evidence." *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988). However, courts can reverse an ALJ's RFC finding if the ALJ improperly rejects an examining physician's opinion in favor of a non-examining physician's opinion. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Dr. Giokaris' determination that Tsakalakis is disabled is not supported by the record. In rejecting Dr. Giokaris's opinion, the ALJ concluded that Dr. Giokaris' letter on December 18, 2005 is wholly conclusory since Dr. Giokaris did not cite any supporting objective findings in labeling Tsakalakis as disabled. Instead, the ALJ

relied on the opinions of treating physicians Drs. Sonnenberg, Zindrick, Nelson, Orth and Shah in determining that Tsakalakis is not disabled. The opinions of these doctors suggested that Tsakalakis is not disabled. Dr. Giokaris's opinion was not "well supported by medical findings" and is "inconsistent with other substantial evidence in the record." *Dixon*, 270 F.3d at 1177. Therefore, the ALJ's credibility determination of Dr. Giokaris will not be overturned because the ALJ was not "patently wrong." *Id.*

Tsakalakis' argument that the ALJ should have given more weight to Dr. Prodromos' June 4, 2007 letter stating that Tsakalakis is permanently disabled is without merit. Dr. Prodromos' reports and statements prior to June 4, 2007 are inconsistent with the letter. On January 30, 2006, Dr. Prodromos indicated that besides the "popeye" muscle in Tsakalakis' left bicep, Tsakalakis had good maintenance in other areas of his body. At that time, Dr. Prodromos recommended against back surgery. Despite noting Tsakalakis' hearing loss, Dr. Prodromos did not indicate that Tsakalakis' hearing aids did not adequately correct the hearing problem. Dr. Prodromos opined on July 16, 2006 that Tsakalakis showed signs of significant improvement following the knee surgery, had a full range motion and could perform light activities. These opinions are contrary to Dr. Prodromos' declaration that Tsakalakis was permanently disabled on June 4, 2007.

Given the inconsistencies, it was reasonable for the ALJ to "ignore an entire line of evidence" such as Dr. Prodromos' June 4, 2007 letter. *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir. 1999). The ALJ further articulated a minimal level of

analysis when he relied on the opinions of Drs. Orth, Shah, and Young-Ja, who found Tsakalakis capable of performing light work.

Finally, Tsakalakis' argument that the ALJ should have given more weight to doctors at Hinsdale Orthopedic Associates fails as well. Tsakalakis asserts that Hinsdale doctors considered Tsakalakis unable to return to work because Dr. Zindick did not define "light duty" when he opined that Tsakalakis should remain off work unless there was a "light duty" job. Additionally, Dr. Zindrick's opinions support a finding that Tsakalakis is not disabled. On September 20, 2005, Dr. Zindrick noted that Tsakalakis had a full range of motion, had no motor weaknesses, and was able to toe walk and heel walk. On February 22, 2006, Dr. Zindrick merely stated that Tsakalakis should remain off of work at his current job unless a light duty job can be identified. These statements are consistent with the ALJ's finding that Tsakalakis could perform light work. Nothing in the record indicates that Dr. Zindrick meant "light duty" in a way inconsistent with the ALJ's interpretation. Therefore, the Court must conclude that the ALJ's determination was supported by substantial evidence. Accordingly, his decision is AFFIRMED.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment (Doc. 13) is DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 16) is GRANTED. The Clerk is DIRECTED to ENTER JUDGMENT in favor of Defendant and against Plaintiff. IT IS SO ORDERED.

CASE TERMINATED.


Entered this <u>1st</u> day of August, 2011.


       s/ Joe B. McDade       

JOE BILLY McDADE

United States Senior District Judge
